Pee Curiam :
This contract case was referred pursuant to Rule 45 (since April 1, 1964, Rule 57) to C. Murray Bernhardt, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. On March 19, 1964, the commissioner filed a report stating that by agreement and stipulation of the parties, the separated issue of liability was to be adjudicated on the basis of the administrative record alone without submission of further evidence and the entire record of proceedings before the Armed Services Board of Contract Appeals was thus admitted into evidence. Such facts as are necessary to decision of the case are found in the commissioner’s opinion. No exceptions to the report or briefs were filed by the parties and it appears that the time for filing such exceptions and brief by the plaintiff has expired. Since the court is in agreement with the opinion, findings and recommendations of the trial commissioner, as modified by the court and as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and its petition is dismissed.
*418 On June 16, 1964, defendant filed herein a motion to dismiss the petition for default under Rule 68. In view of this dismissal of the petition no action is required to be taken on defendant’s motion.
OPINION OP COMMISSIONER
In 1958 the plaintiff partnership contracted to manufacture 300,000 white Navy jumpers (i.e., tops to enlisted men’s uniforms) to be made from bleached cotton twill cloth furnished by the Government. The plaintiff duly appealed four contract disputes to the Armed Services Board of Contract Appeals. On January 29, 1960, the Board sustained the appeal (ASBCA No. 2454) as to three of the four claims but denied the appeal as to the fourth claim, whereupon the plaintiff filed its petition here contending that the Board’s action in denying the appeal was arbitrary and capricious.
The entire record of proceedings before the Board was admitted in evidence by stipulation of the parties, and they agreed that the separated issue of liability was to be adjudicated on the basis of the administrative record alone without submission of further evidence to the court. The plaintiff filed an Assignment of Errors setting forth its contentions as to wherein the adverse decision of the Board was arbitrary and capricious, no allegation having been made there or in the petition of lack of substantial evidence being a ground for review. The defendant duly responded and the controversy is ripe for decision.
The issue is whether the contract required plaintiff to shademark the Government-furnished cloth (GFP). The specifications required the contractor to “Mark all component parts to insure uniform shade throughout the garment.” This would seem to end the inquiry, but the plaintiff claims that if the GFP had been white cotton twill “fully bleached and tinted with vat Blue”, as relevant specifications required, it would not have had to shademark the cloth for cutting and sewing. The plaintiff contends that it justifiably did not contemplate the expense of shademarking in computing its bid, and that shademarking became necessary only because *419 most of the white cloth furnished by the Government did not comply with the color specifications, but was slightly tinted in varying hues of yellow, green, red and blue. In order to decide the disputed issue some general background information is essential.
A commercial garment manufacturer engaged in mass production will unfold and lay out one or more bolts of the cloth to be used on a cutting table, piling it up in a number of layers or, “plies”. A pattern is placed on top of the pile outlining the shapes of the component parts of the garment, and all of the plies are cut simultaneously by a special cutting device. If there are color or shade variations among the bolts of cloth laid out for cutting, each separate bolt is marked with an identifying number so that all of the component parts of each individual garment to be assembled and sewn together will come from the same bolt and the garment will thus be uniform in shade throughout. Otherwise, for example, an arm cut from one bolt of a certain shade might be mismated to a pocket cut from another bolt of the same color but of a slightly different shade, and the resulting garment will not be uniform in shade.
Lack of uniformity in shade is not peculiar to colored cloth; white cloth also varies in shade. Thus in the present case the cloth furnished the plaintiff by the Government had been manufactured under earlier Government contracts by several different manufacturers. The manufacturer of cloth will produce a pilot run of material and submit it to the Government for preproduction compliance testing. From the pilot run the Government will select a standard sample to be the bench mark for that manufacturer’s subsequent production, and the manufacturer will be given an acceptable shade range over and under the shade of the standard sample. The manufacturer’s production must thereafter conform to the standard sample within the tolerances allowed by the shade range. If several manufacturers are producing the same cloth under separate contracts (as happened in this case), each manufacturer will have his *420 own. standard sample and shade range, and there is no exact correspondence in the color standards required of each manufacturer, although the comparison is quite close. But the variations in shade of white cloth produced by several manufacturers will cover a broader spectrum than the shade range prescribed for any manufacturer in a given contract. Thus, in being furnished white cotton twill by the Government which had actually been produced by several different mills, the plaintiff had to work with cloth of greater shade variations than if the cloth furnished it had all come from a single mill.
The inability of a manufacturer of white cotton twill tinted with vat blue to produce cloth of an exactly uniform hue is inherent in the process, is normal, and is unavoidable. Various factors are responsible, such as the native yellowness of different types of cotton in varying degrees, and variations in the bleaching, desizing and finishing processes. Also, white goods tend to yellow in storage, even when not exposed. The result is that even though the manufacturer of the fabric complies rigidly with manufacturing specifications there will still be shade variations in successive lots of the material produced. The slight yellowness of the raw cotton, if not successfully bleached out, will remain in the finished product to darken it to a white-cream, or will combine with the vat blue dye to cause a greenish cast in the material. Sometimes chemical reactions cause a slight reddish or brownish shade. Or the cloth may be white with a bluish tint. These shade variations are subtle, but they become readily apparent in comparing one batch of cloth with another. Textile testing methods employ special controlled lighting conditions to test for color compliance, but the ultimate judge of compliance is the human eye.
In its submission of alleged errors the plaintiff has recited in detail the progress of the contract in suit, the difficulties it encountered because of shade variations of the GFP, the complaints it made to the contracting officer, and the disposition of those complaints. It has related its submission of random samples of the GFP to an independent textile test *421 ing laboratory and the report by the laboratory of substantial deviations of the samples from required shade norms. It also complains that the Government’s findings that the cloth was within an acceptable shade range of contract whiteness were based upon inadequate testing. The fact is, strangely enough, that in testing the random cloth samples for acceptable shade neither the Government testers nor the laboratory hired by plaintiff had in their possession the indispensable criteria of the official acceptable shade ranges applicable to each lot of the cloth tested. They did have available an alleged “standard sample” of dubious authenticity, but unless they had the range of permissible variations from the shade of the official sample it would be impossible for anyone to state authoritatively whether the material being tested did or did not comply with color requirements.
The decision ultimately rests on the quality of the evidence produced before the ASBCA. The plaintiff had one witness before the Board on the subject of shademarking and the Government had two. Mr. Zielinski testified as the principal of the plaintiff partnership. He had been in the garment manufacturing business since 1928 and has had numerous Government contracts. He said that in all his experience he had never had to shademark white goods in making garments for the. Navy because white cloth always matches, and it is not customary to shademark white goods. For this reason he did not include the additional costs involved in shademarking in calculating his bid, and inferentially would not have done so even if he had been aware of the standard specification provision requiring shademarking because he would regard it as irrelevant.
Diametrically opposite advice was received from the Government’s two witnesses before the Board. Both were Navy civilian employees with impressive technical and educational qualifications in this specialized field. They explained the manufacturing process in great detail, some of their testimony being paraphrased earlier in this opinion. The explanation provided by these two witnesses as to the inevitability of and reasons for the shade variations in white *422 goods was conclusive, in my opinion, and far outweighed the evidence offered by plaintiff. It is undoubtedly true that the shade variations in white goods is often so trivial that shademarking is unnecessary in manufacturing garments to insure uniformity. But within the shade range of acceptable white cloth there can be differences in shade so easily discernible that a garment composed helter-skelter of varying shades within the permitted range will not be uniform in appearance. When the Government supplies cloth to a manufacturer of garments for the Government, the contractor is not responsible for the color of the cloth. But if the contract requires him to shademark the cloth in assembling it into garments so as to insure uniformity in shade of each completed garment, it is no defense to say that it is the Government’s fault for supplying material with a color diversity. Even if the GFP is manifestly outside the acceptable shade range or is conceivably a different color, the contractor is still obligated to make it up into garments of a uniform color and shade, which he may do by proper shade-marking, unless the Government inspector prohibits him from using certain lots of GFP because it is flawed for one reason or another. A prudent manufacturer in the plaintiff’s position and with its years of experience in this field should have foreseen the possible need for shademarking the GFP, and the plaintiff’s evidence that white goods never needs shademarking is simply not credible.
The plaintiff has failed to prove that the decision of the ASBGA was arbitrary and capricious as alleged. Nor was the decision lacking in substantial supporting evidence, which was not alleged. The petition should be dismissed.
CONCLUSION OE LAW
Upon the foregoing opinion which includes therein the findings of fact made by the court as a part of its judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.